IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                                    CASE NO. 1:01CR16-MMP/AK

RUBEN DIAZ,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

     This cause is before the Court on Defendant Ruben Diaz' motion to vacate.  Doc. 250.

The Government has filed its response, Doc. 265, and Defendant has filed a reply.  Doc. 268.

The Government then filed a supplemental answer, Doc. 269, to which Defendant filed a

supplemental response.  Doc. 270.  Thereafter, Defendant filed a motion for leave to amend his

motion to vacate, Doc. 274, and later, he filed a second motion for leave to amend.  Doc. 282.[1]

Neither of these motions has been ruled on since they relate to Ground Three of the motion to

vacate.  Finally, Defendant filed a motion for leave to clarify his amended petition, Doc. 291,

which the Court granted, interpreting it as a motion to supplement with an additional exhibit.

Doc. 293.  This cause is therefore in a posture for decision.  Having carefully considered the

_____

[1]There are presently three additional motions--a petition for writ of mandamus, a motion
for jail credit time, and a second petition for writ of mandamus, Docs. 271-273--which have been
properly action required to the district judge assigned to this case and are not affected by this
R&R.

matter, the Court recommends that the motion to vacate be denied.

## BACKGROUND

Defendant and two others were charged in a Third Superseding Indictment with conspiracy to possess with intent to distribute more than one thousand kilograms of marijuana. Doc. 126; *see also* Doc. 135 (correcting scrivener's error and designating Doc. 126 as Third Superseding Indictment).  According to this indictment, the conspiracy lasted from "in or about March, 2000, continuing through in or about October, 2000...."  Doc. 126.  Thereafter, the Court appointed Monica Gustavson as a Spanish interpreter in this case, Docs. 164 & 165, and Jon Uman was appointed to represent Defendant.  Doc. 167.

Shortly afterward, Mr. Uman secured funds to hire a private investigator to locate and interview witnesses, Docs. 171 & 172, and in due course, Mr. Uman filed an *ex parte* motion seeking additional funds for an interpreter.  Doc. 181.  Attached to this sealed motion are invoices from SFD Enterprises, the name of Ms. Gustavson's business, for "Spanish Interpreter Services" for several client conferences with Defendant, who was in custody, and Mr. Uman.  *Id*.

Trial was continued several times, and then on September 30, 2003, Defendant appeared for a change of plea hearing.  Docs. 205 & 206.  At that time, Ms. Gustavson's husband, James Gustavson, was appointed as a Spanish interpreter.  Docs. 203-204.

The Plea Agreement specifically advised Defendant that he faced a "mandatory minimum term of ten years imprisonment [and] a maximum possible penalty of life imprisonment...."  Doc. 206 at 2.  It further provided: "Regardless of any prior representations, the United States Attorney will not agree to recommend or be bound to recommend a specific sentence."  *Id*. at 3.  In addition, the Plea Agreement stated: "[A] sentence greater than anticipated shall not be

grounds for withdrawal of the defendant's plea....The defendant understands that any prediction

of his sentence by any person is not a guarantee or binding promise." *Id*. at 5.  The Plea

Agreement was signed by Defendant, Mr. Uman, and counsel for the Government.  *Id*. at 7.

At the change of plea hearing, the Court advised Defendant regarding waiver of defenses:

THE COURT:          It may be you have some defense to this charge.  I do not
                    know that you have any defense and I am not telling you
                    that you have any defense, but what I am telling you is that
                    if your guilty plea is accepted by the Court this morning,
                    that you then waive, that is you give up any defense that
                    you may have.

                    So knowing yo are giving up any defense that you may
                    have by pleading guilty, do you still wish to plead guilty?

THE DEFENDANT:  Yes.

Doc. 265, Ex. A at 8-9.  When the Statement of Facts was placed on the record, except for the

drug quantities, Defendant agreed that the facts were "otherwise true and correct."  *Id*. at 15.

The Court then explained sentencing to Defendant:

THE COURT:          The maximum sentence that could be imposed upon your
                    plea of guilty is life imprisonment....There's also a
                    mandatory minimum sentence of ten years for this crime....

                    But do you now understand that if your guilty plea is
                    accepted by this Court, that you face a maximum of life
                    imprisonment and a mandatory minimum of ten years
                    imprisonment?

THE DEFENDANT:  Yes.

*Id*.  Defendant advised the Court that Mr. Uman had discussed the Sentencing Guidelines with

him and had explained their applicability to him, and he acknowledged that he understood that a

prediction as to the Guidelines range could not be made till after the Presentence Report (PSR)

had been completed.  *Id*. at 16.  The Court followed up:

> THE COURT:     And do you understand that since the statute here involves the imposition of a mandatory minimum sentence, that that sentence must be imposed upon you even if your guidelines called from a lesser term of imprisonment?
>
> THE DEFENDANT: Yes.

*Id*. at 17.

Defendant acknowledged that before he signed the Plea Agreement, it was "read and explained" to him and that he "fully [understood] all of its terms and conditions."  *Id*. at 18.  The Court continued:

> THE COURT:     Mr. Diaz, have you and your lawyer discussed this plea agreement and he explained to you in more detail than I have just done all of its terms and conditions?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT:     And has anyone made any promise to you, Mr. Diaz, other than those which are actually set forth in this written plea agreement that has in any way induced you or led you to plead guilty to this charge?
>
> THE DEFENDANT: No.
>
> THE COURT:     Does the written plea agreement in fact contain every promise and every understanding that you have reached with the government and based upon the terms of which you are entering your guilty plea here this morning?
>
> THE DEFENDANT: Yes.
>
> THE COURT:     Are there any secret or any undisclosed promises or inducements that have led you to plead guilty to this charge?
>
> THE DEFENDANT: No.

| THE COURT: | By that, I mean neither your lawyer, the government, or any other person has told you anything or has promised you anything that is different than the written terms of this agreement or is in addition to the written terms of this agreement or is contrary to the written terms of this agreement that has in any way induced you to plead guilty to this charge? |

THE DEFENDANT: No.

| THE COURT: | Has any person used any type of threat, force, pressure, intimidation of any type to make you plead guilty? |

THE DEFENDANT: No.

*Id*. at 24-26. The Court then questioned Defendant regarding Mr. Uman's representation:

| THE COURT: | Have you had sufficient time to discuss your case fully with your lawyer and explained to him everything you know about the facts of the case and your involvement in this case? |

THE DEFENDANT: Yes.

* * *

| THE COURT: | During these conferences with your lawyer, has he generally answered what questions you may have and has he explained to you where he thinks you may fall within the Sentencing Guidelines, based upon his current knowledge of the facts of the case and your involvement in the case as well as any prior criminal history that you may have? |

THE DEFENDANT: Yes.

| THE COURT: | And are you satisfied with your lawyer and the way that he has represented you in this case? |

THE DEFENDANT: Yes.

| THE COURT: | Do you have any complaint whatsoever about the way that Mr. Uman or anyone from his office has represented you? |

THE DEFENDANT:  No.

*Id*. at 26-27.

The Court concluded with questions directed to counsel:

THE COURT:          And, Mr. Uman, as the attorney for Ruben Diaz, do you
                    now assure this Court that insofar as you know, there have
                    been no assurances, promises or understandings...given to
                    this defendant as to the disposition of his case which are in
                    any way different or, rather, to what I have discussed with
                    him and now made a matter of record here in open court?

MR. UMAN:           I can so assure the Court.

THE COURT:          Can the government give me that same assurance?

MR. SANFORD:        Yes, Your Honor.

*Id*. at 27.  The Court then found:

The Court now finds you to be alert and intelligent, that you do understand the
nature of the charge against you and appreciate the consequences of pleading
guilty.  I find, further, that your decision to plead guilty was freely, voluntarily,
and intelligently made and that you have had advice and counsel from a
competent lawyer with whom you say you are well pleased, so I accept the guilty
plea.

*Id*.

The PSR calculated Defendant's imprisonment range to be 188 months to 235 months,

and before sentencing, the Government filed a 5K1.1 motion for substantial assistance,

indicating that Defendant's assistance had been "excellent."  Doc. 231.  Counsel did not file any

objections to the PSR,[2] but at sentencing, he advanced several matters which he believed

_____

[2]Though no formal objections were filed in the record, counsel apparently did lodge
objections to the initial PSR.  First, the PSR was amended to "correct a double counting error,"
PSR at p. 19, and the Government represents that this amendment arose after Mr. Uman objected
to a base offense level of 38 that was set forth in an initial PSR, to which the undersigned does

relevant although they would not affect the Guidelines range.  Doc. 265, Ex. B at 3.  In light of

Mr. Uman's arguments, the Court directed the correction of the PSR.  *Id.* at 7.  Mr. Uman then

spoke in mitigation of sentencing, pointing out:

> Mr. Diaz...began cooperating immediately.  There was a slight delay while I
> provided to him the discovery.  He told me the moment I met him he wanted to
> cooperate, that he had been cooperating with state law enforcement officers in
> Miami for several years as a result of the Morales shooting and that he wanted to
> continue to cooperate.  He did not flee and in fact he began working with DEA
> Agent Hellwege and others consistently.
>
> The 5K1 indicates that he has been debriefed for several hours, Your Honor, and I
> think more accurately...that that was approximately 35 hours of debriefings, some
> of those all-day affairs.  The cooperation he was providing to the DEA was
> helpful to Jacksonville....But one thing that Mr. Diaz did which was very...helpful
> to the government...is he convinced his wife...to come forward and cooperate with
> the government.  She had already been sentenced and had really nothing to gain
> and everything to lose by cooperating with the government.  And there was, for
> about six or eight months, a resistance when people surrounded his wife such that
> she was not getting involved in helping the government.  She has finally come
> around with Mr. Diaz's efforts and has given what I understand to be
> very...helpful cooperation and I understand that her testimony is expected to be
> very helpful, clear, precise, and very accurate.
>
> * * *
>
> He also provided organizational flow charts....there are many...people, very
> complicated matters that go all of the way up to the government in Mexico.
> There are government officials that were involved in the proffered sessions and
> this is cooperation/assistance...that I would suggest is very...dangerous to Mr.
> Diaz.
>
> * * *
>
> The Jacksonville case, the state case, arises out of the same facts, same events and
> same conspiracy that's charged in this case....So Mr. Diaz faces in Jacksonville a
> possible consecutive sentence....So, conceivably, Mr. Diaz could be sentenced
> twice or punished twice for the same behavior....I would point out to the Court

---

not have access.  Doc. 265 at 12.

that Mr. Sanford considered Mr. Diaz's cooperation as excellent....So I think that
that ought to be considered if the Court please.

* * *

Together, Your Honor, with his intent to continue to cooperate in what I would
consider Mr. Diaz's good faith in light and in spite of the danger that he
faces–almost certain danger, the people that have shot him; he has a bullet hole in
his face and his brother is dead–I think that it would probably be naive to think
that these gentlemen who the government is now pursuing based upon the
testimony of defendant Diaz will stop their attempts to take Mr. Diaz out.  And I
would ask the Court for a downward departure based upon the 5K1, whatever is
appropriate in this case.

*Id*. at 7-11.

The Court then sentenced Defendant to 150 months imprisonment.  In imposing sentence,

the Court stated that while the sentence was below the Guidelines range, "it is not below the

mandatory minimum," and "it is imposed in recognition of his substantial assistance and also in

recognition of his future cooperation which may allow the Court to revisit the matter."  *Id*. at 13.

The Court also ordered that the sentence run concurrently to any sentence imposed in the state

court case.  *Id*.; *see also* Doc. 235.  Judgment was entered on April 16, 2004.

Defendant did not appeal his sentence, and the instant motion to vacate followed.  On this

occasion, Defendant raises the following claims:

(1)  that his Fifth and Sixth Amendment rights were violated when he was not
give *Miranda* warnings before his post-arrest confession;

(2)  that counsel was ineffective for failing to seek suppression of his illegally
obtained confession;

(3)  that counsel was ineffective for failing to object to incorrect sentencing
guidelines;

(4)  that counsel was ineffective for advising Defendant that if he cooperated and
pled guilty, he would receive no more than 8 years in prison;

(5)  that counsel was ineffective for failing adequately to investigate the case or interview potential witnesses;

(6)  that Defendant's plea was involuntary because counsel coerced him to plead guilty by threatening him if he did not plead guilty, he would receive a life sentence;

(7)  that counsel was ineffective for failing to ensure that Defendant understood the proceedings by having an interpreter present at all stages of negotiations with the Government.

Doc. 250 at 3-5.  Defendant's motions to amend seek to amend the third ground to include *Apprendi* and *Blakely* claims.

## DISCUSSION

1.      Failure to give *Miranda* warnings and failure of counsel to seek suppression of the confession (Grounds One and Two).

In his first and second claims for relief, Defendant maintains that his due process rights were violated when he was not advised of his *Miranda* rights prior to his post-arrest confession, and that counsel was ineffective in failing to challenge that confession.  Neither claim is well taken.

 "A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence."  *United States v. Broce*, 488 U.S. 563, 569 (1989).  The admission of guilt not only waives trial on the charges but also "the right to contest the admissibility of any evidence the [Government] might have offered against the defendant...."  *McMann v. Richardson*, 397 U.S. 759, 766 (1970).  Thus, "when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary."  *Broce*, 488 U.S. at 569.

Defendant was specifically advised at the plea hearing that by entering a plea of guilty, he was waiving any defenses he may have had to the charges against him. This would, of course, include any claim that his confession was obtained in violation of *Miranda*. Thus, the only inquiry is whether Defendant's plea was both counseled and voluntary.

It cannot be disputed that Defendant's plea was counseled; indeed, Defendant told the Court that he and Mr. Uman had spent sufficient time together discussing the case, that Mr. Uman had thoroughly answered all of his questions, and that he had no complaints whatsoever about the quality of Mr. Uman's representation. It also cannot be disputed that Defendant's plea was knowingly and voluntarily entered. The Plea Agreement, which was read and explained to Defendant, advised him that he faced a mandatory minimum ten-year sentence with a possible maximum life sentence. At the plea hearing, the Court reiterated Defendant's sentencing exposure and explained to him that while no prediction of the sentence could be made until after the PSR was completed, in any event, he faced a mandatory minimum ten-year sentence. Defendant acknowledged his understanding of his possible sentence and advised the Court that no promises of any kind had been made to induce his plea and that he had not been threatened, coerced, or intimidated into pleading guilty. Both Mr. Uman and counsel for the Government also assured the Court that this was the case.

The law is well established that a "guilty plea means something. It is not an invitation to a continuing litigation dialogue between a criminal defendant and the court." *Murray v. United States*, 145 F.3d 1249, 1254 (11th Cir. 1998). In fact,

> the representations of the defendant, his lawyer, and the prosecutor at...a [plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations

> in open court carry a strong presumption of verity. The subsequent presentation of
> conclusory allegations unsupported by specifics is subject to summary dismissal,
> as are contentions that in the face of the record are wholly incredible.

*Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). In this Court's view, Defendant's suggestion

now that his plea was not voluntary because Mr. Uman "promised that he would serve no more

than 8 years in prison if he cooperated...and pled guilty" or "coerced him into pleading guilty by

threat that if he did not plead guilty he would receive a life sentence," the claims made in

Grounds Four and Six, is belied by the record and Defendant's own sworn statements in open

court. In short, it is a contention which is "wholly incredible."

Because Defendant's plea was counseled and voluntary, his admission of guilt with its

attendant waiver of defenses to the charges against him is valid, and the claim that his

constitutional rights were violated during the investigatory process is not well taken.

As to his claim that counsel rendered ineffective assistance, the Court begins with a

review of *Strickland v. Washington*, 466 U.S. 668 (1984).

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must

demonstrate (1) that his counsel's performance was below an objective and reasonable

professional norm, and (2) that he was prejudiced by this inadequacy. *Strickland*, 466 U.S. at

686. The court may dispose of the claim if a defendant fails to carry his burden of proof on either

the performance or the prejudice prong. *Id*. at 697. The court need not address the adequacy of

counsel's performance when a defendant fails to make a sufficient showing of prejudice. *Id.; see

also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual

support for his contentions that counsel's performance was constitutionally deficient. *Smith v.*

*White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance.  *Strickland*, 466 U.S. at 689-90.  To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take."  *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment."  *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001).  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions."  *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).  "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy."  *Chandler*, 218 F.3d at 1315 n.16.  "No lawyer can be expected to have considered all of the ways [to provide effective assistance]."  *Id*.  Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on.  The lawyer's strategy was course A.  And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id.*

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.  Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*.  Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable.  *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000).  This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

In this claim, Defendant charges that if counsel had moved to suppress his confession, "harmful, inaccurate evidence would not have been brought forward and he would have received less time."  Doc. 250, Mem. at 6.  According to Defendant, he gave "incriminating statements that were used to the government's advantage in developing conspiracy charges and increasing drug amounts and activities of co-defendants that ultimately caused the defendant's sentencing guidelines to be raised." *Id*.  He does not offer any further particulars.

Because Defendant pled guilty and the case did not go to trial, a motion to suppress would not have prevented the Court from considering relevant conduct developed during the

investigation from other sources.  According to the Statement of Facts supporting the Plea

Agreement, *see* Doc. 206, and the PSR, the investigation into Defendant's activities began in

July, 2000, with the arrest of Armando Castro.  PSR at ¶ 7.  Castro revealed the existence of a

Mexican organization, the Romero Organization.  *Id*.  The arrest of Jose Hernandez in 2001 led

authorities to another Mexican organization, the Gonzalez Organization, and it was Hernandez

who identified Defendant as a marijuana distributor for the Romero Organization.  *Id*. at ¶ 8.

Hernandez advised agents that after Defendant and Romero severed ties following a dispute,

Defendant began getting marijuana directly from the Gonzalez Organization, estimating that

Defendant received approximately 4,000 to 4,500 pounds of marijuana each month from

Gonzalez.  *Id*.

In July, 2001, members of the Romero Organization were indicted, and Cesar Reyes

began cooperating.  *Id*. at ¶ 9.  He confirmed information from Castro and Hernandez regarding

the Romero Organization and advised agents that he met Defendant during a marijuana

distribution trip he took with Osvaldo Romero.  *Id*.  He also advised agents that he had

personally traveled to Jacksonville, Florida, to retrieve money from Defendant which he then

delivered to the Gonzalez Organization in Mexico.  *Id*.

In 2002, agents re-interviewed Hernandez.  *Id*. at ¶ 11.  On this occasion, Hernandez

advised agents that after Defendant split with Romero, Orestes Perez-Pujol, a close friend of

Defendant's and a part of the Romero Organization, began transporting marijuana for Defendant.

*Id*.

On August 26, 2002, Edwin Ovalles and Felix Carela were arrested in Jacksonville with

1,400 pounds of marijuana they were delivering to Defendant from the Gonzalez Organization.

*Id*. at ¶ 12.  Ovalles and Carela advised authorities that Defendant had sold one kilogram of cocaine and 243 pounds of marijuana to Teofilo Quinones.  *Id*.  When Defendant and others were arrested by state agents in Duval County, Florida, an additional 3,000 pounds of marijuana, 134 kilograms of cocaine, and $1.3 million in cash was seized from Defendant's home.  *Id*.

In 2003, Jesus Monge, a co-defendant in the Duval County case, advised agents that he became aware of Defendant's drug activities in October, 2000.  *Id*. at ¶ 13.  According to Monge, Defendant asked him to transport money to Mexico, and in 2001, he accompanied Nestor Perez to New York to pick up approximately $500,000 for Defendant.  *Id*. at ¶ 14.  When Monge and Perez returned to Florida, Defendant gave them an additional $350,000, which they transported to Mexico.  *Id*.  Beginning in December, 2001, Monge made bi-monthly trips to Mexico, and on each occasion, he took at least $500,000.  *Id*. at ¶ 15.  Monge further advised agents that the money was almost always picked up in Mexico by Michael Gonzalez, a member of the Gonzalez Organization, and he estimated that between December, 2001, and August, 2002, he delivered between $10 and 15 million from Defendant to the Gonzalez Organization.  *Id*.

The probation officer found that Defendant was responsible for "at least 800 pounds of marijuana per month (31,200 pounds)" and 135 kilograms of cocaine.  *Id*. at ¶ 18.  Based on an agent's estimation of street value, the officer translated the marijuana into $10 million in sales, representing the sale of approximately 25,000 pounds of marijuana at $400 a pound.  *Id*.

The 800-pounds-a-month figure is significantly less than the amount that Hernandez attributed to Defendant and instead, represents the low end of the figure which Defendant gave to the probation officer.  *See id*. at ¶ 8  Because of the quantities of drugs involved, which converted to 27,884.5 kilograms of marijuana, Defendant's base offense level was 36.  *Id*. at ¶

23.  If the officer had used Hernandez's figures, then Defendant's base offense level would have been 38, which alone represents a 235-293 months sentence.  If counsel had gotten Defendant's statements to authorities suppressed, there is a reasonable probability that he would have received the higher base offense level and would not have received any credit for acceptance of responsibility.  Without credit for acceptance of responsibility, Defendant's total offense level would then have jumped to 41, and he would have been facing 324-405 months imprisonment, instead of 188-235 months.  Thus, because Defendant was cooperative in the investigation, his Guidelines sentence was significantly less than if the officer had credited everything else that the investigation revealed, which, as outlined above, was, standing alone, more than sufficient to convict Defendant and significantly to increase the jail time he faced even without any statements from Defendant himself.  In short, Defendant cannot establish any prejudice from counsel's failure to seek suppression of any statements he gave law enforcement authorities.

     2.      Failure to object to incorrect sentencing guidelines (Ground Three).

     In his original § 2255 motion, Defendant charges in Ground Three that counsel was ineffective for failing to object to the base offense level as calculated in the PSR.  Doc. 250, Mem. at 8.  According to him, the base offense level should have been 32 because he was only charged with and pled guilty to conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana.  *Id*.  He does not give any further basis for this claim.

     In his reply, however, Defendant, in an attempt to "clarify" this claim or to add a "different or new claim" of ineffective assistance, Doc. 268 at 1, states that Mr. Uman was ineffective when he failed to object to the PSR based on *Apprendi* and *Blakely* since Defendant "could only be sentenced for the quantity of marijuana charged during the time of March 2000 to

October 2000," which is the time frame charged in the Third Superseding Indictment.  *Id*. at 3.

Defendant also claims in his reply that he was improperly assessed three points for his role as a supervisor because two of the persons he allegedly supervised either were not named in the indictment or were "irrelevant" because they were outside the time frame of the indictment. *Id*. at 4.  Thus, counsel was ineffective for failing to challenge the PSR on this ground as well. *Id*.  According to Defendant, counsel's errors at sentencing resulted in a 42-63 month error without any consideration of substantial assistance.  In his view, the correct Guidelines range was 87-108 months.  *Id*.

The Government opposes the claims raised in the reply as either untimely or foreclosed under Eleventh Circuit law.  Doc. 269.

In his first motion to amend, Defendant states that he "does not wish to raise a new claim, only to incorporate the attached amendment" to Ground Three.  Doc. 274.  In this motion, Defendant argues again that counsel was ineffective for failing to object to the PSR since he could only be held accountable for the amount of drugs he actually possessed as proved beyond a reasonable doubt.  *Id*. at 3-4.

Subsequently, Defendant filed a second motion to amend Ground Three.  Doc. 282.  In the second proposed amendment, Defendant argues again that counsel was ineffective for failing to object to drug quantities outside the time frame of the conspiracy charged in the indictment, citing *Booker* and *Cunningham v. California*, ____ U.S. ____, 127 S.Ct. 856, 166 L.Ed. 2d 856 (2007), which invalidated California's determinate sentencing law as violative of a defendant's right to trial by jury.

Finally, Defendant submitted hospital records to show that he was hospitalized with life-

threatening injuries from March, 2000, to April, 2000, and thus, could not have been "mastermining" the drug distribution conspiracy charged in the indictment. Doc. 291. He further claims that because he cannot speak English, he was "handicapped" and did not "truly understand[ ] and comprehend[ ] that his attorney [was] failing to protect his constitutional rights...." *Id*. at 4. The attached records show an 11-day hospital stay from March 24, 2000, to April 4, 2000, for an "accidental gunshot wound to the face." *Id*. at Attach.

In the interest of judicial economy, the Court will simply consider all of these claims, and the motions to amend will be granted only to that extent. As to the issue of counsel's ineffectiveness because he failed to attack the base offense level in the PSR based on the amount of drugs charged in the Third Superseding Indictment, the claim is without merit. Even after *Booker* (which was not the law at the time of Defendant's sentencing), the Court may continue to determine drug quantity and other extra-verdict enhancements by a preponderance of the evidence. *United States v. Rodriguez*, 398 F.3d 1291, 1297 (11th Cir. 2005). The law is clear that in a conspiracy case, the relevant conduct of the co-conspirators is properly considered in assessing a defendant's overall offense level, including the "quantity of drugs that passed through" the co-conspirators. *United States v. Gallashaw*, 213 Fed. Appx. 792, 795 (11th Cir. 2007). Relevant conduct is considered under a preponderance of the evidence standard, not the beyond a reasonable doubt standard. *Id*.

Although the issue of drug quantity was plainly reserved for sentencing, by the time of sentencing, the drug quantity question had been resolved with Mr. Uman having succeeded in getting the PSR modified to correct any issue of double counting. Based on the facts to which Defendant agreed at the plea, Mr. Uman would have been well aware that Defendant would be

held accountable for all of the drugs transported during the course of the conspiracy, not just to

the narrow time frame of the indictment.  Defendant admitted involvement with both the Romero

and Gonzalez Organizations, and a two-week hospitalization is hardly sufficient to show a

disavowal and abandonment of his participation in the drug conspiracy.  He agreed at the plea

hearing that if the case were to go to trial, the Government could have proved beyond a

reasonable doubt, his long-term association with these organizations.  In fact, in an evidentiary

hearing involving one of Defendant's co-defendants, Hernandez testified that Roberto Romero

introduced him to Defendant on December 22, 1999, and he identified Defendant's role in the

Romero Organization as receiving the "marijuana at his house, to sort out the good from the bad,

and to distribute it to the clients in Miami."  Doc. 134 at 32.  He emphatically stated that

Defendant was "not a truck driver."  *Id*.  He also testified about the split between Romero and

Defendant and that Defendant continued the marijuana business in Jacksonville.  *Id*. at 35-36 &

38.  According to Defendant after the split with Romero, Defendant received the marijuana in

Jacksonville and distributed it, the "same as he was doing in Miami...."  *Id*. at 36.  According to

Hernandez, Orestes Perez "work[ed] directly" for Defendant.  *Id*.

        To the extent that Defendant raises a *Booker* claim, it fails as well.  The Eleventh Circuit

has held that *United States v. Booker*, 543 U.S. 220, 244 (2005), which expanded the reach of

*Blakely* to federal criminal cases, is not retroactively applicable to cases on collateral review, as

"*Booker*'s constitutional rule falls squarely under the category of new rules of criminal

procedure that do not apply retroactively to § 2255 cases on collateral review."  *Varela v. United

States*, 400 F.3d 864, 868 (11th Cir. 2005).

        The Court also rejects any claim that Defendant did not understand the proceedings, as

that suggestion is plainly belied by his sworn statements before this Court.

3.      Advice regarding sentence (Ground Four).

In this claim, Defendant charges that Mr. Uman was ineffective for advising Defendant

that if he cooperated and pled guilty, he would receive no more than 8 years in prison.  As more

fully discussed in Section 1, *supra*, this claim is belied by Defendant's sworn testimony at the

plea hearing.  The Court specifically explored the issue of whether counsel or the Government or

anyone else had made any promises to Defendant regarding the length of his sentence or any

other matter that was not memorialized in the Plea Agreement.  Defendant and both attorneys,

who are sworn officers of the Court, assured the Court without hesitation that no additional

promises beyond those stated in the Plea Agreement existed.  Defendant's suggestion otherwise

in this proceeding is wholly incredible in light of those facts.

4.      Failure to investigate or interview potential witnesses (Ground Five).

In this claim, Defendant charges that counsel was ineffective for failing to "investigate,

interview, or depose any of the 25 co-defendants that were listed in this case."  Specifically, he

points to Hernandez and claims that he was "lying about the amount of marijuana he was

delivering."  He also maintains that investigation would have revealed that Defendant "was not

primary distributor of marijuana in Miami, but instead was...Romero," and that "no cocaine

[was] found at the Defendant's home and the amount of cash seized was highly exaggerated."  In

Defendant's view, this left him with no choice but to plead guilty because he was deprive of a

defense.

As previously stated, the act of pleading guilty waives any possible defense that a

defendant may have to the charges against him.  Furthermore, counsel had no right to interview

or depose Defendant's co-defendants, who had their own counsel and their own Fifth

Amendment right to remain silent and not incriminate themselves in any manner.  In addition,

the Federal Rules of Criminal Procedure contemplate the deposition of witnesses only in limited

circumstances, none of which is alleged here.  *See* Fed. R. Crim. P. 15 (witness deposition may

generally be taken only to preserve testimony).

During the plea colloquy Defendant admitted that if the case went to trial, the

Government would be able to prove the matters about which he now complains.  At sentencing,

he told the Court that he had discussed the PSR with counsel, and in fact, the extent of counsel's

objections at the hearing show that he had indeed investigated this case and discussed it

thoroughly with Defendant.  Furthermore, counsel's unrefuted affidavit shows that he not only

received discovery in this case and the state case but that he reviewed with Defendant all the

discovery from the Government and from Defendant's counsel in the Duval County case.

In short, counsel did not perform deficiently in his handling of this case, and by no means

has Defendant established any prejudice thereby.

5.      Threat of life imprisonment (Ground Six).

As covered in Sections 1 and 3, *supra*, this claim is patently meritless in light of the

record established at the plea hearing.

6.      Failure to have interpreter present at all stages of negotiation (Ground Seven).

Defendant claims that he "did not understand everything that was being said" during the

plea and sentencing hearings.  He maintains that although he had an interpreter during these

proceedings, he did not understand "the conditions of what he was pleading to."  He also charges

that the Court failed to inquire as to whether he "'fully'" understood the terms and consequences

of his plea and whether counsel had "pressured him into entering the guilty plea."

This claim, as are many others in this proceeding, is wholly without merit and belied by the record and further discussion in not warranted in light of Defendant's unflinching and sworn statements during the proceedings in this case.

## CONCLUSION

As none of Defendant's claims have merit, the Court respectfully **RECOMMENDS**:

That the motion for leave to amend, Doc. 274, be **GRANTED**;

That the motion for leave to amend.  Doc. 282, be **GRANTED**;

That the motion to vacate, Doc. 250, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this _**25**<sup>th</sup>_ day of February, 2008.

_s/ A. KORNBLUM_
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**